IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-785

No. COA21-455

Filed 6 December 2022

Guilford County, No. 20 JA 512

IN THE MATTER OF: J.N.J.

Appeal by Respondent-Mother from orders entered 22 July 2020, 29 July 2020, and 18 May 2021 by Judge Marcus A. Shields in Guilford County District Court. Heard in the Court of Appeals 9 February 2022.

*Mercedes O. Chut for Petitioner-Appellee Guilford County Department of Health and Human Services.*

*Kimberly Connor Benton for Respondent-Appellant Mother.*

*Parker Poe Adams & Bernstein LLP, by Collier R. Marsh, for the Guardian ad Litem.*

JACKSON, Judge.

¶ 1     Respondent-Mother argues that (1) the trial court's findings are insufficient because they merely restate allegations from the Petition and are unsupported by clear and convincing evidence; (2) the remaining supported findings do not support an adjudication of neglect and dependency; and (3) the trial court failed to make necessary constitutional findings in order to properly apply the best interest of the child standard. First, we hold that while some minor portions of the findings are unsupported and must be disregarded, the remaining portions are supported by clear

and convincing evidence. Moreover, despite mirroring language from the Petition, we are confident that the trial court used a process of logical reasoning when making its ultimate findings. Second, we hold that these findings support the conclusion that Jason[1] was neglected and dependent, and therefore affirm the trial court's order on adjudication. Lastly, because we hold that Respondent-Mother's constitutional argument was not properly preserved for our review, we do not address its merits.

## I.    Background

On 28 July 2019, Respondent-Mother gave birth to Jason. The following day, a report was filed with the Guilford County Department of Health and Human Services ("DHHS") originating this case because Respondent-Mother had other children in DHHS custody at the time. Due to his premature birth at 25 weeks, Jason remained hospitalized for treatment of various medical conditions. Jason was on a breathing tube and was consequently prohibited from being in contact with smoke, smoke particulate, and residue due to his respiratory condition. Jason's home and any car he traveled in also had to be free of smoke residue. His doctors also required Jason to be supervised 24 hours a day, necessitating two full-time caretakers. Because Jason needed a tracheal tube and ventilator, both caretakers needed to be medically trained to care for him and use the necessary equipment.

---

[1] The parties stipulate to the use of this pseudonym for ease of reading and to protect the child's privacy.

On 30 July 2019, Social Worker R. Turner visited Jason and Respondent-Mother at the hospital. During the visit, Respondent-Mother admitted that she had other children in DHHS custody and did not have visitation with them. Respondent-Mother also told Social Worker Turner that she did not know who Jason's father was and that she believed he was conceived at a party in Atlanta where she had sex with multiple people while intoxicated. DHHS was concerned about Jason's medical issues, Respondent-Mother's other children in custody, and the circumstances of Jason's conception. Based on Respondent-Mother's history with DHHS, Social Worker Turner was concerned about Respondent-Mother's poor decision-making and lack of improvement after taking mandated parenting classes.

Eventually, Respondent-Mother identified Jason's father and provided his contact information to Social Worker Turner. Respondent-Father[2] alleged that he had instructed Respondent-Mother to lie about Jason's parentage, specifically instructing her to tell the story that she had engaged in unprotected sex with multiple people at a party. Respondent-Mother admitted to following Respondent-Father's instruction and lying to DHHS.

In October 2019, Social Worker Young visited Respondent-Mother's home to determine if it would be an appropriate home for Jason when he was released from

---

[2] Respondent-Father is not a party to this appeal.

the hospital. At this visit, she discovered that Respondent-Mother was living with an unknown roommate and observed that the home smelled like incense had been burning, both of which concerned DHHS. Separately, a nurse who visited Respondent-Mother's home also detected a "smoky smell." A home visit was also conducted by Social Worker Turner for Respondent-Father's home sometime in October. At this visit, Social Worker Turner observed multiple ashtrays, a glass bong, a tobacco smoke odor, and the odor of what could have been marijuana. Although Respondent-Father denied the bong belonged to him, he admitted to smoking cigarettes and marijuana.

¶ 6          A background check was conducted on Respondent-Father, and DHHS discovered multiple criminal convictions, including assault on a female, communicating threats, assault with intent to inflict serious injury, misdemeanor child abuse, contributing to the delinquency of a minor, resisting a public officer, assault with a deadly weapon on a government official, as well as various drug, larceny, and robbery convictions. Additionally, during the home visit, Social Worker asked Respondent-Father about a 911 call for a domestic disturbance, and he advised that an altercation occurred when the mother of another child of his discovered his involvement with Respondent-Mother. This altercation between Respondent-Father and the mother resulted in the 911 call, and the mother and her child moved out of the home.

¶ 7 On 6 December 2019, Social Worker Turner and hospital staff met with Respondent-Mother and Respondent-Father to discuss Jason's discharge from the hospital. Jason's parents advised DHHS that they were not living together or in a relationship but would be co-parenting. DHHS was concerned with this arrangement, because Jason needed two caretakers living in the home with him to provide 24-hour medical care. Respondent-Father informed DHHS that he had not yet spoken with his employer about Jason's needs or his work schedule and that he "sleeps really hard and has a difficult time with hearing alarms." Social Worker Turner asked Respondent-Mother who Jason's two caretakers would be if placed in her care, and Respondent-Father instructed Respondent-Mother not to answer the question. Respondent-Mother did not directly answer the question or identify anyone by name but vaguely indicated that she had "supports."

¶ 8 After the December meeting, Respondent-Father recommended his brother and sister-in-law as a potential placement option. However, the couple expressed that they were no longer interested in being caretakers for Jason due to their concerns with Respondent-Mother's behavior and the possibility that they were moving to a new home. Social Worker Turner also contacted Respondent-Father's mother, who advised that she could not be a placement option and did not have any other family members that could be considered for placement. At a later meeting between Respondent-Mother and Social Worker Turner, Respondent-Mother again failed to

provide other placement options.

¶ 9 Meanwhile, while Jason was hospitalized, the case for his sisters was still pending. A permanency planning hearing for Jason's sisters was held on 20 November 2019. The permanency planning order,[3] entered on 9 December 2019, changed the primary permanent plan from reunification to adoption, with a secondary plan of reunification. The sisters remained in DHHS custody. The trial court found that the barriers to reunification were, *inter alia*: (1) the juveniles were afraid to return home; (2) Respondent-Mother's inability to demonstrate what she learned in domestic violence classes; (3) Respondent-Mother's inability to verbalize why her children came into DHHS custody or her role in that outcome; (4) Respondent-Mother's minimization of the effects of domestic violence on her children; (5) Respondent-Mother's admission that she had intercourse with an unidentified man at a party while intoxicated; (6) Respondent-Mother's honesty; and (7) Respondent-Mother's violation of a court order and failure to comply with her case plan.

¶ 10 The Petition and non-secure custody order for Jason were filed six months after his birth, on 30 January 2020, while he was still in the hospital. The Petition alleged

---

[3] At Jason's hearing on adjudication, Judge Shields took judicial notice of the permanency planning order in Jason's sisters' pending case, in which he was also the presiding judge.

that Jason did not receive proper care, supervision, or discipline, lived in an environment injurious to his welfare, and Jason's parents were unable to provide for his care or supervision and lacked an appropriate childcare arrangement. At the time the Petition was filed, Respondent-Father had not completed any of the necessary training to care for Jason, and Respondent-Mother had completed some but not all of the training. Neither parent had an appropriate, smoke-free home, and the parents also had not provided an alternative, suitable two-caretaker home to meet Jason's medical needs.

¶ 11        At the first non-secure custody hearing in February 2020, both Respondent-Mother and Respondent-Father were prohibited from visiting with Jason because they admitted to smoking. At the second non-secure custody hearing in April 2020, Respondent-Mother was granted supervised visits with Jason at the hospital, provided she was smoke, particulate, residue, and odor free. She was not permitted to drive her car to the visit unless she provided DHHS with a receipt showing that it had been professionally cleaned and was smoke-free. Jason remained hospitalized until 28 April 2020, when he was placed in a foster home.

¶ 12        The hearing on adjudication was held over two days, on 5 June 2020 and 1 July 2020. Two social workers, R. Turner and K. Young, testified on behalf of DHHS. On 22 July 2020, the trial court adjudicated Jason a neglected and dependent juvenile. An amended adjudication order was filed on 29 July 2020 to correct the file number.

The trial court conducted a hearing on disposition on 12 February and 12 March 2021. On 18 May 2021, the disposition order was entered. Respondent-Mother timely filed a Notice of Appeal from the adjudication and disposition orders and an Amended Notice of Appeal to include the amended adjudication order.

## II. Discussion

Respondent-Mother argues that (1) the trial court's findings are insufficient because they merely restate allegations from the Petition and are unsupported by clear and convincing evidence; (2) the remaining supported findings do not support an adjudication of neglect and dependency; and (3) the trial court failed to make necessary constitutional findings in order to properly apply the best interest of the child standard. We address each argument in turn.

### A. Standard of Review

For adjudications in abuse, neglect, or dependency cases, the standard of review is whether the findings of fact are supported by clear and convincing evidence. *In re J.A.M.,* 372 N.C. 1, 8, 822 S.E.2d 693, 698 (2019). *See* N.C. Gen. Stat. § 7B-805 (2021). However, we do not review challenged findings that are unnecessary to support a trial court's determination. *See In re S.R.F.*, 376 N.C. 647, 654, 656, 2021-NCSC-5, ¶ 16, 19. *See also In re C.J.,* 373 N.C. 260, 262, 837 S.E.2d 859, 860 (2020) (declining to review challenged findings unnecessary to support the grounds for adjudication). Unsupported findings or portions of findings are disregarded, and we

review only the proper findings when determining whether the findings of fact support the conclusions of law. *See S.R.F.,* 376 N.C. at 654, 656, 2021-NCSC-5 ¶ 16, 19. Findings of fact supported by clear and convincing evidence are "deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019). Conclusions of law are reviewed *de novo. In re M.H.*, 272 N.C. App. 283, 286, 845 S.E.2d 908, 911 (2020) (citation omitted).

## B. Findings of Fact

¶ 15 Respondent-Mother argues that the trial court's findings are insufficient because they merely restate allegations from the petition and are unsupported by clear and convincing evidence. While we agree that portions of the trial court's findings are unsupported, we hold that the remaining supported findings are sufficient to support the trial court's adjudication of Jason as neglected and dependent.

¶ 16 The Juvenile Code provides that adjudication orders "shall be in writing and shall contain appropriate findings of fact and conclusions of law." N.C. Gen. Stat. § 7B-807(b) (2021). These factual findings "must be the specific ultimate facts[,] sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence." *In re H.P.*, 278 N.C. App. 195, 202, 2021-NCCOA-299, ¶ 23 (internal marks and citation omitted).

¶ 17        Acknowledging the reality that trial courts in our State have "little or no support staff to assist with order preparation," we have repeatedly held that

> it is not per se reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party. Instead, this Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case. If we are confident the trial court did so, it is irrelevant whether those findings are taken verbatim from an earlier pleading.

*In re J.W.*, 241 N.C. App. 44, 48-49, 772 S.E.2d 249, 253 (2015).

¶ 18        Here, the following relevant findings were not challenged by Respondent-Mother, are supported by clear and convincing evidence from the Record, and are therefore binding on appeal:

> 8.      [Respondent-Mother] has two (2) other minor children who are not the subject of this proceeding . . . . The juveniles are currently in the custody of the Guilford County Department of Health and Human Services, pursuant to a Petition and non-secure custody order filed April 20, 2019, alleging neglect and dependency. The current plan for the juveniles was changed to adoption pursuant to a Permanency Planning Hearing on November 20, 2019 with the Order for that hearing entered by the Court on December 11, 2019. Pursuant to that Order, the plan was changed to adoption based on [Respondent-Mother's] lack of compliance with the majority of her case plan for those juveniles, which include the mother's failure to successfully demonstrate improvement in her decision-making regarding parenting and relationships; the mother's understanding of domestic violence; and the

mother's ability to properly vet partners. The Court took judicial notice of the Permanency Planning Hearing Order entered on December 11, 2019 pursuant to the hearing held on November 20, 2019 in the companion sibling case.

. . .

11. No appropriate relative placements have been identified.

¶ 19 Respondent Mother, however, challenges Findings of Fact 14 through 27 of the trial court's order on adjudication. Specifically, she argues that "Findings of Fact #14-27 are nothing more than mere reiterations of statements to [DHHS] and are not supported by the evidence, and there is no evidence the trial court used any logical reasoning to make its ultimate findings of fact." While Respondent-Mother "does not deny [DHHS] presented some evidence" at the hearing, she takes issue with the fact that "[t]he court verbatim adopted its findings of fact from Exhibit A" and, in her view, "failed to use logical reasoning to make findings of the ultimate facts."

¶ 20 Omitting minor unsupported details, we hold that the following challenged findings are supported by clear and convincing evidence:

14. The Guilford County Department of Health and Human Services received a report on July 29, 2019. Reporter stated that [Respondent-Mother] gave birth to a newborn baby on July, 28 2019. Reporter stated that the infant was born at 25 weeks and will remain in the NICCU [sic] for a while. Reporter advised [Respondent-Mother] has other kids in the custody of GCDHHS. At that time, [Respondent-Mother] refused to give the name of the biological father.

15.    On July 30, 2019 Social Worker Turner went to the Greensboro Women's Hospital and spoke with [Respondent-Mother] . . . .    Social Worker Turner addressed the allegations and inquired about [Respondent-Mother's] plan.    [Respondent-Mother] advised that she currently has a foster care case with her two daughters . . . .    [Respondent-Mother] shared that visitation was stopped by the Department . . . .    Social Worker Turner asked for the name of [Jason's] father, and [Respondent-Mother] stated that she honestly did not know because it could be one of several men with whom she had intercourse at a party in a different state during the holiday season of 2018.    Social Worker Turner requested any names or any information she could recall, and [Respondent-Mother] stated that she had no information.

16.    On August 16, 2019, the Department held a Child and Family Team Meeting (CFT) . . . .    During this meeting the issues discussed were as follows: (1) CPS report received on July 29, 2019; (2) newborn child was born with medical issues; (3) [Respondent-Mother's] other children currently in DSS custody[;] and (4) safety concerns for this child. [Respondent-Mother] stated that she has worked her case plan, and her situation is not the same as when her other children came into custody.    The Department was also concerned as to who the father is of this child. [Respondent-Mother] stated that she did not know who the father was . . . .    [Respondent-Mother] gave [] names, one of which . . . she advised was the homeowner of where the party was where she became heavily intoxicated and engaged in sexual relations.    [Respondent-Mother] stated that it was an emotional time for her as her children were taken into custody, so she went out on the town in Atlanta. [Respondent-Mother] appeared to know nothing about the men she slept with.    [Respondent-Mother] stated that she just signed a lease to her new house.    [Respondent-Mother] presented a copy of the lease.    [DHHS] explained that the Department continues to be concerned about the choices that she is making and concerned about her not

demonstrating parenting skills that she has learned in her parenting classes. . . . [Respondent-Mother] is currently in therapy with Ms. [M.] Seeley and there have been concerns by the Department as to whether she is providing appropriate treatment to [Respondent-Mother]. [Respondent-Mother] was asked about the current status of her newborn and she advised that he is in the NICU born at 25 weeks, currently 28 weeks gestational. Not ready for discharge for 6 more weeks. [Respondent-Mother] was breast feeding. . . . [Jason was] on a breathing machine until he can breathe on his own. . . .

17. [I]n August . . . 2019, [Social Worker] Turner received an email from [Respondent-Mother] advising that she found the father of [Jason] and provided his contact information.

18. [I]n August . . . 2019, [Social Worker] Turner . . . met with [Respondent-Father] and collected a DNA sample to determine paternity. [Social Worker] Turner inquired about his plan for the child and any other placement options for him. [Respondent-Father] advised that he would be taking care of [Jason] and maybe [Respondent-Father's] mother, but he was not certain if she could. . . . [Respondent-Father's] criminal record . . . reflects various larceny and robbery charges as well as assault with a deadly weapon on a government official, resisting public officer, . . . contributing to the delinquency of a minor, . . . assault on a female, communicating threats, assault with intent to inflict serious injury, and misdemeanor child abuse.

. . .

21. . . . Social Worker Turner conducted a home visit with [Respondent-Father] and noted that the home had an odor of lingering smoke residue [and] that of cigarettes and what appeared to be marijuana. Social Worker Turner noticed various ashtrays . . . and a glass bong in a back room/den area of the home. [Social Worker] Turner

addressed the smoke odors and smoking paraphernalia. [Respondent-Father] denied owning the glass bong pipe but stated that he does engage in marijuana and cigarette use. Social Worker Turner inquired about the status of his relationship with [Respondent-Mother]. He advised that they were in [a]. . . relationship . . . . [Respondent-Father] advised that he knew [Respondent-Mother] was pregnant from the beginning of her pregnancy and he has always known that the child was his. . . .

22. On November 20, 2019, Social Worker Turner was informed that the plan for [Respondent-Mother's] daughters had been changed to adoption due to [Respondent-Mother] being out of compliance with the majority of her case plan, including not being able to successfully demonstrate a change in improving her decision-making regarding parenting and relationships, understanding of domestic violence and properly vetting partners.

23. On December 6, 2019, a Child and Family Team meeting (CFT) was held at Wake Forest Baptist Hospital NICU. The attendees included: [Respondent-Father], [Respondent-Mother], . . . [R.] Miller- MD-Neonatology, [J.] Kerth-Nurse Practitioner-Pediatric Pulmonology, [S.] Crabtree-Pediatric Pulmonology Attending . . . . The medical team advised of the child's medical needs including a tracheal tube, a ventilator and ongoing developmental needs due to underdeveloped airways and his premature status. Medical Staff advised that there would need to be 2 fully trained 24-hour caregivers prior to discharge. Restrictions included no smoking in the home, vehicles or smoke residue on the hands or clothes of anyone providing care for or being with [Jason]. [Respondent-Father] advised that he needed to take some time and consider the information and speak with his employer. He shared that he is a very hard sleeper and doesn't hear alarms while sleeping . . . . During the CFT, [Respondent-Father] stated that he encouraged [Respondent-Mother] to be dishonest

with the Department about her initial story about [Jason's] conception and naming the father. [Respondent-Mother] advised that this was true. Social Worker Turner inquired about the current status of their relationship and their plan for his care. [Respondent-Mother] advised that they were only co-parenting. Social Worker Turner asked what that meant and what that looked like . . . . Social Worker Turner asked who the trained caretakers would be for [Jason] as [Respondent-Father] expressed his plan to care for him. Social Worker Turner asked whose home would be the primary residence and whether the other parent would join them at that home. [Respondent-Father] instructed [Respondent-Mother] not to answer Social Worker Turner. After the CFT was concluded, Nurse Merrill advised that when she visited [Respondent-Mother's] home, there was a "smokey [sic] smell" that she would be working with [Respondent-Mother] on the smell.

24.    [I]n December . . . 2019, a meeting was held with [Respondent-Mother] per her request . . . . The Department's concerns were re-explained to [Respondent-Mother] as well as other placement options including transfer of custody to caretakers identified by [Respondent-Father] and she was asked if she had any other placement options for the child and she advised she did not have any additional placement options.

25.    . . . Social Worker Turner spoke with . . . [Respondent-Father's] sister in-law and identified caretaker. [Respondent-Father's sister in-law] advised that . . . she and her husband felt that there were too many concerns regarding [Respondent-Mother], and they would no longer [be] interested in being the caretakers for [Jason].

26.    . . . Social Worker Turner called and spoke with . . . [Respondent-Father's] brother and desired potential caretaker. [Respondent-Father's brother] advised that he and his wife have decided to no longer be the caretakers for [Jason]. . . . [Social Worker] Turner asked if their mother

> would be an option and [Respondent-Father's brother] stated that they had not discussed it since she was caring for another grandchild and they did not want to add additional burdens to her[.]
>
> 27. . . . Social Worker Turner phoned . . . paternal grandmother of [Jason] and inquired about her interest and ability to be a possible caretaker and placement option for [Jason]. [She] advised that she would not be able to care for or be a placement option for [Jason].

¶ 21 Respondent-Mother relies primarily on *In re H.P.*, 278 N.C. App. 195, 2021-NCCOA-299, to support her argument that these findings, which closely track the language of Exhibit A to the Petition, are mere recitations that do not demonstrate that the trial court exercised logical reasoning. However, in *In re H.P.*, this Court held that the trial court did not "through the process of logical reasoning, find the ultimate facts necessary to dispose the case" where "*no* evidence to support the allegations in Exhibit A was presented at the adjudication and disposition hearing, and several of the allegations in Exhibit A could not be substantiated[.]" 278 N.C. App. at 204, 2021-NCCOA-299 at ¶ 26 (internal marks and citation omitted) (emphasis added). In addition to many of the findings being "mere recitations" from the petition's exhibit, this Court held that (1) "[f]our of the trial court's findings expressly state that 'there was not evidence' to support other allegations the trial court found as fact in the adjudication order"; (2) "three other findings of fact by the trial court recognize that there was insufficient evidence to support the allegations

accepted as fact in other findings"; (3) many of the statements included in the findings "were not corroborated by any of the testimony given at the adjudication hearing"; and (4) "[t]he contents of Exhibit A[,]" where the language was lifted for the findings of fact, "are contradictory on its face and, therefore, not competent evidence." *Id*. at 203-04, 2021-NCCOA-299 at ¶ 24-28.

¶ 22        Here, unlike in *In re H.P.*, many of the allegations in Exhibit A to the Petition were supported by evidence presented at the hearing. At the hearing on adjudication, which spanned two days, DHHS presented the testimony of two social workers, one of whom corroborated many of the allegations in the Petition. Although some minor details from the Petition were not supported by testimony at the hearing, including, *inter alia*, specific dates, names of persons, and a handful of statements, these unsupported details, which were omitted from our recitation above, were not necessary to adjudicate Jason as neglected or dependent, as demonstrated further below. Moreover, unlike *In re H.P.*, here, the findings of fact were not self-contradictory and did not depend on allegations that lacked sufficient evidence.

¶ 23        We therefore hold that all of the above findings are supported by the social workers' testimony at the adjudicatory hearing. Based on this evidence and the trial court's detailed orally rendered judgment, "the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the

case." *In re J.W.*, 241 N.C. App. at 48-49, 772 S.E.2d at 253. Because we are confident that the trial court used logical reasoning to reach its findings, "it is irrelevant whether those findings are taken verbatim from an earlier pleading." *Id.* Further, because we do "not review challenged findings that are unnecessary to support the trial court's determination[,]" and unsupported findings or portions of findings are similarly disregarded, *In re S.R.F.*, 376 N.C. at 654, 656, 2021-NCSC-5 ¶ 16, 19, we will review only the above findings when determining whether the findings of fact supported the trial court's determination that Jason was neglected and dependent.

## C. Neglect

¶ 24      A "neglected juvenile" is defined by statute as "[a]ny juvenile . . . whose parent, guardian, custodian, or caretaker does . . . not provide proper care, supervision, or discipline[,]" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (e) (2021). "In neglect cases involving newborns," or in Jason's case as a medically fragile infant, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect based on the historical facts of the case." *In re J.A.M.*, 372 N.C. 1, 9-10, 822 S.E.2d 693, 699 (2019) (internal quotation marks and citation omitted).

¶ 25 "To adjudicate a juvenile neglected, some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline is required." *In re R.B.*, 280 N.C. App. 424, 432, 2021-NCCOA-654, ¶ 18 (internal quotation and citation omitted). *See also In re Padgett*, 156 N.C. App. 644, 648, 577 S.E.2d 337, 340 (2003) ("Where there is no finding that the juvenile has been impaired or is at substantial risk of impairment, there is no error if all the evidence supports such a finding."). "Similarly, in order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm." *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted). A court "need not wait for actual harm to occur to the child if there is a substantial risk of harm." *In re D.B.J.*, 197 N.C. App. 752, 755, 678 S.E.2d 778, 780 (2009) (quotation and citation omitted).

¶ 26 The prior adjudication of a sibling as neglected may not, standing alone, support an adjudication of neglect. *In re J.A.M.,* 372 N.C. at 9-10, 822 S.E.2d at 699 (2019). Instead, additional factors must be present "'to suggest that the neglect . . . will be repeated.'" *Id.* (citing *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 213 (2014). A parent's failure to correct the conditions that lead to the prior adjudication of neglect, including the failure to address domestic violence, may support the

likelihood of the repetition of neglect. *See In re D.L.W.*, 368 N.C. 835, 843-44, 788 S.E.2d 162, 167-68 (2016) (holding that the trial court's findings regarding ongoing domestic violence in the home after the prior adjudication of neglect "support[ed] the conclusion that there would be a repetition of neglect based upon the juveniles' living in an environment injurious to their welfare") (cleaned up).

¶ 27 Here, the trial court adjudicated Jason neglected, as defined by N.C. Gen. Stat. § 7B-101(15).

¶ 28 We are "required to consider the totality of the evidence to determine whether the trial court's findings sufficiently support its ultimate conclusion that" Jason is a neglected juvenile. *In re F.S.*, 268 N.C. App. 34, 43, 835 S.E.2d 465, 471 (2019). As described above, because of his premature birth, Jason was a medically fragile juvenile. Even when the Petition was filed six months after his birth, Jason remained hospitalized for his safety. Jason had difficulty breathing on his own, and hospital staff advised that in order for him to be released from the NICU, Jason needed two full-time caretakers medically trained to use and monitor his breathing equipment. Jason was not permitted to be near smoke odor, residue, or particulate in his home or transportation, which would interfere with his health and ability to breathe. Therefore, his caretakers had to be clean of smoke odor, residue, and particulate as well.

¶ 29    First, the trial court properly concluded that Respondents were unable to provide proper care and supervision for Jason.  The trial court found that neither Respondent-Mother nor Respondent-Father had completed the necessary medical training to care for Jason at the time the Petition was filed.  Although Respondent-Mother points out that she completed "some" of the training for Jason's care during his six months in the NICU, this incomplete training was not sufficient for Jason to be discharged to her care.  Moreover, even if Respondent-Mother had completed the necessary training, she would still not be capable of providing proper care on her own, as she did not have a second caretaker with the necessary medical training living in the home where she planned to raise Jason.  Although Respondent-Mother indicated that she planned to "co-parent" with Respondent-Father, she refused to tell Social Worker Turner which home would be Jason's primary residence or whether both parents would reside with Jason in the home.  The trial court repeatedly found that no additional caretakers were presented by Respondent-Mother.

¶ 30    Second, the trial court properly concluded that Jason was neglected due to an injurious environment.  Based on the trial court's findings, Respondent-Mother's home had a "smoky smell" when one of Jason's nurses conducted a home visit, and Respondent-Father's home also had a smoke odor and contained various smoking paraphernalia, including ashtrays and a bong.  Both parents also admitted to smoking, which is why they were not permitted to visit with Jason.  Therefore, had

Jason been allowed to return home to live with Respondent-Mother or Respondent-Father, due to the presence of smoke odor and his respiratory condition, his home environment would result in a substantial risk of his physical impairment.

¶ 31       In addition to the presence of smoke odor in Jason's environment, Respondent-Mother repeatedly engaged in relationships with domestic violence and failed to learn from her parenting and domestic violence courses. As demonstrated by the adjudication of Jason's siblings as neglected, Respondent-Mother's history of poor decision-making and domestic violence contributed to Jason's sisters being removed from her custody and recommended for adoption. Additionally, in Jason's case, Respondent-Mother's relationship with Respondent-Father was a concern to DHHS and the trial court. The trial court expressed concern that "based upon her previous history of domestic violence, and having taken classes for domestic violence and was in therapy, . . . that [Respondent-Mother] was able to conceive a child with someone she did not know all of the background, who had a violent history or tendencies related to violence, specifically had [an] assault on a female conviction[,]" in addition to a misdemeanor child abuse conviction.

¶ 32       Although according to Respondent-Mother, Respondents were not in a relationship, the findings reflect that Respondent-Father instructed Respondent-Mother to lie to DHHS about Jason's paternity, inventing the story about having intercourse with strangers at a party in Atlanta, and then further instructed

Respondent-Mother not to answer Social Worker Turner's questions regarding their co-parenting plan. The trial court again expressed concern that Respondent-Mother "was able to be controlled by [Respondent-Father]" when "a component of the therapy is the Crossroads program in her other case, which identifies domestic violence skills, especially for battered women[,]" and Respondent-Father's control over her "resulted in her telling the [D]epartment false information . . . , and [] it took her almost a month to tell the truth" about Respondent-Father's paternity. The court further stated that Respondent-Mother "was unable to use the skills that she developed in her therapy and services provided to give truthful information or to assess intimate partners that she might come in contact with." Given that Jason's sisters were also removed from Respondent-Mother's care over domestic violence concerns contributing to their injurious environment, these findings regarding Respondent-Mother's involvement with Respondent-Father amply support a failure to address these concerns and a repetition of that neglect.

¶ 33        We therefore hold, in light of the trial court's supported findings, Jason was properly adjudicated a neglected juvenile.

**D. Dependency**

¶ 34        A "dependent juvenile" is defined by statute as a "juvenile in need of assistance or placement because . . . the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative

child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2021). Therefore, a child is not dependent so long as there is one parent who can either care for the child or make appropriate alternative childcare arrangements for the child. *In re Q.M.*, 275 N.C. App. 34, 42, 852 S.E.2d 687, 693 (2020). "Adjudicatory hearings for dependency are limited to determining only the existence or nonexistence of any of the conditions alleged in the petition." *Id.* at 39, 852 S.E.2d at 691 (internal marks and quotation omitted). We have previously held that "the trial court must consider 'the conditions as they exist at the time of the adjudication as well as the risk of harm to the child from return to a parent.'" *In re F.S.*, 268 N.C. App. at 46, 835 S.E.2d at 473 (citation omitted).

¶ 35        Here, the trial court found that Jason should be adjudicated "dependent, as the parents lack an appropriate child care arrangement," and thereby concluded that Jason was dependent as defined by N.C. Gen. Stat. § 7B-101(9). Because the trial court's findings also addressed whether Respondents were "unable to provide proper care and supervision[,]" they supported the trial court's adjudication of dependency.

¶ 36        As described above, the trial court properly found that Respondents were unable to provide the proper care and supervision Jason needed in his medically fragile state, due to the dangers posed by the smoke odor in their homes, their inability to complete the necessary medical training, and their inability to articulate

how, in their plan to "co-parent," that Jason would be supervised full-time in the home by two trained caretakers as medically required for his release.

¶ 37    Likewise, the trial court properly found that the parents lacked an appropriate child care arrangement. Respondent-Father proposed his brother and sister-in-law, who later told Social Worker Turner that they were not willing to be Jason's caretakers. Respondent-Father's mother also indicated she did not want to be considered as a caretaker and that she had no other family interested. Respondent-Father proposed no other possible caretakers. While Respondent-Mother vaguely indicated that she had "supports," when asked for specific names by Social Worker Turner, she repeatedly failed to name any potential caretakers for Jason. Although Respondent-Mother argues on appeal that she suggested either her friend or sister to DHHS, social worker testimony demonstrated that neither Respondent-Mother's friend or sister were approved by DHHS in the case involving Respondent-Mother's other children, and therefore they were not considered in Jason's case. Moreover, and more importantly, none of Respondent-Mother's proposed arrangements accounted for the two full-time, live-in caretakers that were medically required for Jason's care, and this is adequately reflected in the trial court's findings.

¶ 38    Therefore, in light of the trial court's supported findings, neither parent could care for Jason or make appropriate childcare arrangements for him, and Jason was properly adjudicated a dependent juvenile.

**E. Constitutionally Required Findings**

After adjudicating Jason neglected and dependent, the trial court found that it was "contrary to [his] health and safety to be returned to the custody of a parent" at that time, and that it was "in the best[] interest of the juvenile to remain in the legal and physical custody of" DHHS. Respondent-Mother argues that the trial court incorrectly applied the best interest of the child standard in "awarding custody of Jason" to DHHS without first making a finding that Respondent-Mother was "unfit" or "acted inconsistently with her constitutionally protected rights" as a parent. Respondent-Mother contends that her constitutional argument is automatically preserved under N.C. R. App. P. 10(a)(1). We disagree.

Parents have several constitutional protections arising from the Due Process and Equal Protection clauses of the Fourteenth Amendment, as well as the Ninth Amendment to the United States Constitution, as recognized by our Supreme Court in *Petersen v. Rogers*, 337 N.C. 397, 401, 445 S.E.2d 901, 903 (1994). However,

> [n]othing in *Petersen* serves to negate our rules on the preservation of constitutional issues. Thus, a parent's argument concerning his or her paramount interest to the custody of his or her child, although afforded constitutional protection, may be waived on review if the issue is not first raised in the trial court.

*In re J.N.*, 381 N.C. 131, 133, 2022-NCSC-52, ¶ 8.

In *In re J.N.*, our Supreme Court rejected an argument nearly identical to

Respondent-Mother's. In that case, the respondent likewise argued that "the trial court erred by granting guardianship without first concluding that respondent was an unfit parent or had acted inconsistently with his constitutional right to parent[,]" and that this argument was "automatically preserved under N.C. R. App. P. 10(a)(1)[.]" *Id.* at 132-33, 2022-NCSC-52 at ¶ 5-6. Our Supreme Court was not persuaded, and instead affirmed a unanimous decision from this Court, *In re J.N.*, 276 N.C. App. 275, 2021-NCCOA-76, ¶ 8 (unpublished), ultimately holding that, because the respondent "failed to assert his constitutional argument in the trial court[,]" despite the respondent's opportunity to do so, he had not properly preserved his constitutional argument for appeal. *In re J.N.*, 381 N.C. at 133-34, 2022-NCSC-52 at ¶ 9-10.

¶ 42          Here, like the respondent in *In re J.N.*, despite the trial court affording all parties an opportunity to present closing arguments at the conclusion of each hearing, Respondent-Mother did not raise a constitutional argument at either the adjudicatory or dispositional hearings. DHHS acknowledged that while reunification was still the goal of Jason's permanent plan, DHHS recommended that he remain in DHHS custody for his health and safety. Although Respondent-Mother argued, *inter alia*, that she was capable of providing a safe, permanent home for Jason and wanted face-to-face visitation with him, she did not at any point argue that leaving Jason in DHHS custody was a violation of her constitutional rights. Therefore, because Respondent-

Mother was afforded an opportunity to raise her constitutional argument at trial and did not do so, we conclude that she has waived this argument for our review.

### III.    Conclusion

Because the trial court used logical reasoning to make adequate factual findings, supported by clear and convincing evidence, that supported an adjudication of Jason as neglected and dependent, the trial court's order on adjudication is

AFFIRMED.

Judge DIETZ concurs.

Judge MURPHY dissents by separate opinion.

No. COA21-455 – *In re: J.N.J.*

MURPHY, Judge, dissenting.

¶ 44       Though not addressed at length in the preceding opinion, I would first like to underscore the unprecedented nature of the Majority's decision to base its determination, in any part, on findings of fact in an "orally rendered judgment" that does not appear in the trial court's order. *See supra* ¶ 23. This is a remarkable departure from our ordinary review process which, having now been written into our precedent, will present an unworkable burden to future litigants challenging a trial court's findings of fact—now, appellants must not only challenge findings committed to writing by the trial court, but also those the trial court *declined* to include in its order. While *In re J.W.* does allow for a degree of pragmatic leniency in our review, nowhere does it authorize us to upend the procedural norms of our abuse, neglect, and dependency jurisprudence by basing our review on findings outside the trial court's written order.[4] *See In re J.W.*, 241 N.C. App. 44, 48-49, *disc. rev. denied*, 368 N.C. 290 (2015),

¶ 45       Furthermore, while a trial court may quote a juvenile petition verbatim in its findings of fact without committing reversible error, it cannot do so at the expense of

---

[4] This is especially troubling given the stringency with which we typically limit the scope of our review on the basis that "unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." *In re R.D.B.*, 274 N.C. App. 374, 379-80 (2020). While I do not dispute the practical necessity of that procedural rule, it strikes me as profoundly unprincipled that we would underscore the formal importance of the trial court's written findings of fact when individual appellants might benefit from flexibility and leniency, only to treat the same findings with flexibility and leniency when appellants might benefit from formality.

having found the ultimate facts necessary to dispose of the case through a process of logical reasoning based on the evidentiary facts before it. When, on the other hand, a trial court's findings of fact deviate from the evidence before it so significantly that whether its findings were based on logical reasoning becomes unclear, it reversibly errs. Here, in quoting the juvenile petition verbatim, the trial court based its reasoning in the adjudication order so heavily on information that was not presented to the trial court as evidence that the central logic of its position became compromised. This was reversible error, and I would remand for adequate factfinding.

## BACKGROUND

As discussed by the Majority, Jason was born prematurely in July 2019 at 25 weeks and was placed in the newborn intensive care unit ("NICU") to address his health needs related to his underdeveloped respiratory system. The following day, the Guilford County Department of Health and Human Services ("DHHS") received a child protective services report indicating that Jason was born prematurely and placed into the NICU, that he would remain there for some time, and Respondent-Mother had other children in the custody of DHHS.

One day later, at the hospital where Respondent-Mother had given birth, a DSS employee spoke with Respondent-Mother regarding the allegations in the report. Over the following six months, DHHS had several meetings with Respondent-Mother

and Respondent-Father, including two Child and Family Team ("CFT") meetings. Over the course of the meetings, DHHS determined that Jason was a neglected and dependent juvenile and, on 30 January 2020, filed a juvenile petition.

¶ 48    The trial court entered a non-secure Custody Order on 30 January 2020. After an evidentiary hearing, the trial court entered its Adjudication Order on 22 July 2020, finding Jason to be neglected and dependent pursuant to N.C.G.S. § 7B-807. *See* N.C.G.S. § 7B-807 (2021); *see also* N.C.G.S. § 7B-101 (2021). On 29 July 2020, the trial court entered its Amended Adjudication Order, with the only amendment being a change to the file number in the order. On 18 May 2021, the trial court entered its Disposition Order that ordered legal and physical custody of Jason remain with DHHS and kept him in his foster placement. Respondent-Mother timely appeals.

## ANALYSIS

¶ 49    Respondent-Mother argues (A) the trial court erred in adjudicating Jason neglected because "it failed to make findings of fact based upon clear and convincing evidence"; (B) the trial court committed reversible error in adjudicating Jason neglected and dependent because it "failed to make necessary findings of fact, there was insufficient evidence to support the findings of fact, and the findings which are supported by the evidence are insufficient to support its conclusions of law"; and (C) the trial court "incorrectly applied the best interest of the child standard in awarding custody of [Jason] to [DHHS] without first finding [Respondent-Mother] was unfit or

had acted inconsistently with her constitutionally protected rights as a parent." I would remand on the basis of Respondent-Mother's first argument and, as a result, would not reach her remaining arguments on appeal.

¶ 50        "The role of this Court in reviewing a trial court's adjudication of neglect and abuse is to determine '(1) whether the findings of fact are supported by "clear and convincing evidence," and (2) whether the legal conclusions are supported by the findings of fact[.]'" *In re T.H.T.*, 185 N.C. App. 337, 343 (2007) (quoting *In re Gleisner*, 141 N.C. App. 475, 480 (2000)), *aff'd as modified*, 362 N.C. 446 (2008). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *Id.*

¶ 51        However, as we discussed in *In re H.P.*, the trial court's findings of fact must display a "process[] of logical reasoning[] based on the evidentiary facts before it" that results in a finding of "the ultimate facts necessary to dispose of the case":

> The Juvenile Code provides that adjudication orders "shall contain appropriate findings of fact and conclusions of law." [N.C.G.S.] § 7B-807(b) [(2021)]. Rule 52 of our rules of civil procedure mandates the trial court make findings of "facts specially and state separately its conclusions of law thereon . . . ." [N.C.G.S.] § 1A-1, Rule 52 [(2021)]. "[T]he trial court's factual findings must be more than a recitation of allegations. They must be the specific ultimate facts . . . sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence." *In re Anderson*, 151 N.C. App. 94, 97[] . . . (2002) (citing *Montgomery v. Montgomery*, 32 N.C. App. 154, 156-57[] . . . (1977)). It is "not *per se* reversible error for a trial court's

> fact findings to mirror the wording of a petition or other
> pleading prepared by a party . . . . this Court will examine
> whether the record of the proceedings demonstrates that
> the trial court, through processes of logical reasoning,
> based on the evidentiary facts before it, found the ultimate
> facts necessary to dispose of the case." *In re J.W.*, 241 N.C.
> App. 44, 48-49, . . . *disc. review denied*, 368 N.C. 290[] . . .
> (2015). "Ultimate facts are the final resulting effect
> reached by processes of logical reasoning from the
> evidentiary facts." *In re Anderson*, 151 N.C. App. at 97[;] .
> . . *see also In re H.J.A.,* 223 N.C. App. 413, 418[] . . . (2012).

*In re H.P.,* 278 N.C. App. 195, 2021-NCCOA-299, ¶ 23, *appeal dismissed*, 379 N.C.

155 (2021).

In that case, "the trial court made forty-seven findings of fact in the

adjudication order"; however, "many of the findings of fact in the adjudication order

[were] mere recitations of the allegations in Exhibit A that was attached to the

juvenile petition." *Id.* at ¶ 24. "Several of the trial court's findings [were] verbatim

recitations of the allegations in the juvenile petition. Four of the trial court's findings

expressly state[d] that 'there was not evidence' to support other allegations the trial

court found as fact in the adjudication order." *Id.* "Although not explicitly stated,

three other findings of fact by the trial court recognize[d] that there was insufficient

evidence to support the allegations accepted as fact in other findings." Under the

circumstances, we held that the findings of fact were mere recitations of allegations

because there was no evidence presented to support the allegations otherwise. *Id.* at

¶ 26. We also held "the trial court did not, through the process of logical reasoning,

find ultimate facts necessary to dispose of the case." *Id.* (marks omitted).

¶ 53 The Majority correctly points out that, when reviewing the trial court's factfinding, pragmatism requires that we do not review challenged findings that are unnecessary to support a trial court's determination and that we review only the proper findings when determining whether the findings of fact support the conclusions of law. *See supra* ¶¶ 14, 17. However, I do not believe—as it is clear we did not believe in *In re H.P.*—that the limitation of our review to the dispositive features of the findings of fact frees the trial court from its duty to issue its orders above a minimum standard of clarity and coherence. The limitation of our analysis to the facts necessary to support the trial court's determination is, as I understand it, an exercise in resolving factual disagreement; it operates similarly to surplusage in a criminal indictment, freeing the judicial system from the need to undo and redo procedures simply because a document was more specific than necessary. *See State v. Bollinger*, 192 N.C. App. 241, 246 (2008) ("Allegations beyond the essential elements of the crime sought to be charged are irrelevant and may be treated as surplusage."), *aff'd*, 363 N.C. 251 (2009); *see also Surplusage*, Black's Law Dictionary (9th ed. 2009) ("1. Redundant words in a statute or legal instrument; language that does not add meaning . . . 2. Extraneous matter in a pleading . . . .").

¶ 54 Conversely, the trial court's responsibility to "find ultimate facts necessary to dispose of the case" through a "process of logical reasoning" necessarily reflects a

concern not only for whether the facts found were actually supported, but also whether the trial court evaluated the case with adequate care and consideration. *In re H.P.*, 2021-NCCOA-299 at ¶ 26. If it were truly the case that the trial court's findings of fact could be upheld as liberally as the Majority claims, then this requirement would have virtually no meaning; any amount of disarray or patent absence of logic in a trial court's factfinding would be tolerable as long as some subset of propositions cherry-picked from the document—no matter how small—could amount to a justification of the result. Whatever description may apply to such a scenario, it would not be a "process[] of logical reasoning . . . ." *Id.*

¶ 55        Bearing the above in mind, I turn to Respondent-Mother's specific argument on appeal. She contends that Findings of Fact 14 through 27 are "mere recitations of statements made to [DHHS] and are not supported by the evidence." Here, the challenged findings of fact state:

> 14. The Guilford County Department of Health and Human Services received a report on [29 July 2019]. Reporter stated that [Respondent-Mother] gave birth to a newborn baby on [28 July 2019]. Reporter stated that the infant was born at 25 weeks and will remain in the NICCU [sic] for a while. Reporter advised [Respondent-Mother] has other kids in the custody of GCDHHS. At that time, [Respondent-Mother] refused to give the name of the biological father.
>
> 15. On [30 July 2019] [DSS employee] Turner went to the Greensboro Women's Hospital and spoke with [Respondent-Mother] and observed the infant in the

incubator in the NICU with [Respondent-Mother]. [DSS employee] Turner addressed the allegations and inquired about [Respondent-Mother's] plan. [Respondent-Mother] advised that she currently has a foster care case with her two daughters due to them being present during a domestic violence incident with her boyfriend at that time. [DSS employee] Turner inquired about [Respondent-Mother's] case plan with her daughters, and [Respondent-Mother] stated that she has done everything that was required of her by the Department including domestic violence classes, drug reassessment classes, therapy and parenting classes. [Respondent-Mother] stated that she has not had contact with her abuser, she moved, changed her phone number and blocked him on all social media. [Respondent-Mother] shared that visitation was stopped by the Department because she asked her daughter how her father was doing and told her to tell him she said hello. [Respondent-Mother] received an email afterwards stating that she would no longer have visitation due to her mentioning the child's father. [Respondent-Mother] explained her interpretation of the rules was that she was not supposed to ask about his visitation and did not know she could not ask anything or mention him at all; and because it was unclear, her visits were taken. [DSS employee] Turner explained that a Child and Family Team Meeting ("CFT") would have to be scheduled to address the plan for the child. [Respondent-Mother] advised that she does not want [Jason] in foster care and would prefer for him to go to a family member and listed her sister . . . . [DSS employee] Turner asked for the name of [Jason's] father, and [Respondent-Mother] stated that she honestly did not know because it could be one of several men with whom she had intercourse at a party in a different state during the holiday season of 2018. [DSS employee] Turner requested any names or any information she could recall, and [Respondent-Mother] stated that she had no information.

16. On [16 August 2019], the Department held a Child and Family Team Meeting (CFT) facilitated by Supervisor

Rhonda Oboh, present were: [DSS employee] Turner, Supervisor Sherline McLean, [DSS employee] Kimberly Young, Supervisor Rose Cromartie, [Respondent-Mother], Godmother [], maternal aunt . . . , friend . . . , friend . . . and friend . . . . During this meeting the issues discussed were as follows: (1) CPS report received on [29 July 2019]; (2) newborn child was born with medical issues; (3) [Respondent-Mother's] other children currently in DSS custody[;] and (4) safety concerns for this child. [Respondent-Mother] stated that she has worked her case plan, and her situation is not the same as when her other children came into custody. The Department was also concerned as to who the father is of this child. [Respondent-Mother] stated that she did not know who the father was, there were the potential of 2 fathers. [Respondent-Mother] gave two names, one of which . . . she advised was the homeowner of where the party was where she became heavily intoxicated and engaged in sexual relations. [Respondent-Mother] stated that it was an emotional time for her as her children were taken into custody, so she went out on the town in Atlanta. [Respondent-Mother] appeared to know nothing about the men she slept with. [Respondent-Mother] stated that she just signed a lease to her new house. [Respondent-Mother] presented a copy of the lease. Ms. McLean explained that the Department continues to be concerned about the choices that she is making and concerned about her not demonstrating parenting skills that she has learned in her parenting classes. It was stated that at that time [Respondent-Mother] could not have unsupervised visits with her children in custody based on the last court hearing. The next court date was [23 October 2019]. The children had been in custody for 16 months, and [Respondent-Mother] had two violations since the children came into custody. [Respondent-Mother] was concerned that someone told her children that she had a new baby and she instructed the [DSS employee] and supervisor not to tell her children about the baby. Ms. McLean explained that [neither] she nor [DSS employee] Young told the children about the

baby. Ms. McLean asked [Respondent-Mother] if she told the therapist, Lisa Partin. [Respondent-Mother] stated no. [Respondent-Mother] is currently in therapy with Ms. Michelle Seeley and there have been concerns by the Department as to whether she is providing appropriate treatment to [Respondent-Mother]. [Respondent-Mother] was asked about the current status of her newborn and she advised that he is in the NICU born at 25 weeks, currently 28 weeks gestational. Not ready for discharge for 6 more weeks. [Respondent-Mother] was breast feeding. He weighed 1 lb. at birth and at the time of this CFT, he weighed 2 lbs. 5 oz. with no special needs except for him being on a breathing machine until he can breathe on his own. [DSS employee] Turner sent a diligent efforts search for [the man identified as the potential father].

17. On [19 August 2019], [DSS employee] Turner received an email from [Respondent-Mother] advising that she found the father of [Jason] and provided his contact information.

18. On [27 August 2019], [DSS employee] Turner and Social Worker Supervisor Cromartie met with [Respondent-Father] and collected a DNA sample to determine paternity. [DSS employee] Turner inquired about his plan for the child and any other placement options for him. [Respondent-Father] advised that he would be taking care of [Jason] and maybe [Respondent-Father's] mother, but he was not certain if she could. [DSS employee] Turner asked about the status of the relationship with [Respondent-Mother] and he advised that they are in a relationship and had been for approximately 1 year. [DSS employee] Turner inquired about his criminal background and he advised that he has had several charges and convictions including assault on a female and was just released from prison not long ago. [Respondent-Father's] criminal record dates back to 2003 and reflects various larceny and robbery charges as well as assault with a deadly weapon on a government official,

resisting public officer, felony and misdemeanor probation violations, contributing to the delinquency of a minor, traffic violations, flee and eluding arrest, possession with intent to distribute marijuana, cocaine, and possession of marijuana charges, possession of firearm by felon, assault on a female, communicating threats, assault with intent to inflict serious injury, and misdemeanor child abuse.

19. On [17 September 2019], [DSS employee] Turner received the DNA test results which confirmed by 99.99% probability of paternity that [Respondent-Father] is the biological father of [Jason].

20. On [30 October 2019], [DSS employee] Turner called [Respondent-Father] after reviewing missed calls from the number provided for him, although the phone number ID reflected [Respondent-Mother's] name. [DSS employee] Turner spoke with him and requested to visit his home. [DSS employee] Turner requested to visit his home on [1 November 2019] at 1pm and [Respondent-Father] agreed. On [1 November 2019], [DSS employee] Turner and GCDHHS Nurse Brown went to the home for the appointment and discovered that no one was home.

21. On [7 November 2019], [DSS employee] Turner conducted a home visit with [Respondent-Father] and noted that the home had an odor of lingering smoke residue that of cigarettes and what appeared to be marijuana. [DSS employee] Turner noticed various ashtrays full of cigarette butts and a glass bong in a back room/den area of the home. [DSS employee] Turner addressed the smoke odors and smoking paraphernalia. [Respondent-Father] denied owning the glass bong pipe but stated that he does engage in marijuana and cigarette use. [DSS employee] Turner inquired about the status of his relationship with [Respondent-Mother]. He advised that they were in an on and off relationship over the last year. However, he advised that he "can't deal with her and all that drama and attitude" and he is no longer in a relationship with her.

[DSS employee] Turner asked when he became aware that [Respondent-Mother] was pregnant and when he became aware that the infant might be his biological child. [Respondent-Father] advised that he knew [Respondent-Mother] was pregnant from the beginning of her pregnancy and he has always known that the child was his. He stated that [Respondent-Mother] called him one day stressing that the Department was repeatedly requesting the name of the father. He advised that he instructed [Respondent-Mother] to tell the Department that he is the father since it was the truth and they both knew he is the father.

22. On [20 November 2019], [DSS employee] Turner was informed that the plan for [Respondent-Mother's] daughters had been changed to adoption due to [Respondent-Mother] being out of compliance with the majority of her case plan, including not being able to successfully demonstrate a change in improving her decision-making regarding parenting and relationships, understanding of domestic violence and properly vetting partners.

23. On [6 December 2019], a Child and Family Team meeting (CFT) was held at Wake Forest Baptist Hospital NICU. The attendees included: [Respondent-Father], [Respondent-Mother], Lee Daniels -Hospital [Social Worker], Rachel Miller- MD-Neonatology, Julie Kerth-Nurse Practitioner-Pediatric Pulmonology, Shana Crabtree-Pediatric Pulmonology Attending, Theresa Merrill- RN CC4C Case Nurse Manager, Rykiell Turner-CPS [DSS employee], Susie Edwards-CPS Social Worker Supervisor[,] [and several family friends or relatives]. The medical team advised of the child's medical needs including a tracheal tube, a ventilator and ongoing developmental needs due to underdeveloped airways and his premature status. Medical Staff advised that there would need to be 2 fully trained 24-hour caregivers prior to discharge. Restrictions included no smoking in the home, vehicles or smoke residue on the hands or clothes of anyone providing

care for or being with [Jason]. [Respondent-Father] advised that he needed to take some time and consider the information and speak with his employer. He shared that he is a very hard sleeper and doesn't hear alarms while sleeping. [Respondent-Mother] and her supports recommended that the child be placed in her care. The Department noted ongoing concerns and provided various options for the care and placement of [Jason]. During the CFT, [Respondent-Father] stated that he encouraged [Respondent-Mother] to be dishonest with the Department about her initial story about [Jason's] conception and naming the father. [Respondent-Mother] advised that this was true. [DSS employee] Turner inquired about the current status of their relationship and their plan for his care. [Respondent-Mother] advised that they were only co-parenting. [DSS employee] Turner asked what that meant and what that looked like, and [Respondent-Mother] advised that they communicate regarding [Jason's] care and updates. [DSS employee] Turner asked who the trained caretakers would be for [Jason] as [Respondent-Father] expressed his plan to care for him. [DSS employee] Turner asked whose home would be the primary residence and whether the other parent would join them at that home. [Respondent-Father] instructed [Respondent-Mother] not to answer [DSS employee] Turner. After the CFT was concluded, Nurse Merrill advised that when she visited [Respondent-Mother's] home, there was a "smokey smell" that she would be working with [Respondent-Mother] on the smell.

24. On [18 December 2019], a meeting was held with [Respondent-Mother] per her request and present were, CC4C Nurse Manager Merrill, [DSS employee] Turner, Social Worker Supervisor Susie Edwards, Foster Care [DSS employee] Kimberly Young, Program Manager Carole Allison, Foster Care Program Manager Karen Williamson, the father was not in attendance. The Department's concerns were re-explained to [Respondent-Mother] as well as other placement options including

transfer of custody to caretakers identified by [Respondent-Father] and she was asked if she had any other placement options for the child and she advised she did not have any additional placement options.

25. On [14 January 2020], [DSS employee] Turner spoke with . . . [Respondent-Father's] sister in-law and identified caretaker. [Respondent-Father's sister in-law] advised that although she still wanted to be the caretaker for [Jason], she and her husband felt that there were too many concerns regarding [Respondent-Mother], and they would no longer [be] interested in being the caretakers for [Jason].

26. On [23 January 2020], [DSS employee] Turner called and spoke with . . . [Respondent-Father's] brother and desired potential caretaker. [Respondent-Father's brother] advised that he and his wife have decided to no longer be the caretakers for [Jason]. [Respondent-Father's brother] advised that he had not heard from his brother regarding any other plans. [DSS employee] Turner asked if their mother would be an option and [Respondent-Father's brother] stated that they had not discussed it since she was caring for another grandchild and they did not want to add additional burdens to her. [DSS employee] Turner called [Respondent-Father] and was unable to leave a voicemail as it was not set up. [DSS employee] Turner sent [Respondent-Father] a text requesting that he contact [DSS employee] Turner to address a plan of care for [Jason] with no response as of [30 January 2020].

27. On [24 January 2020], [DSS employee] Turner phoned . . . paternal grandmother of [Jason] and inquired about her interest and ability to be a possible caretaker and placement option for [Jason]. [She] advised that she would not be able to care for or be a placement option for [Jason].

These findings are nearly identical to paragraphs 4 through 17 of Exhibit A of the

juvenile petition, although the language has been updated in most places to remove

abbreviations. Additionally, of the three handwritten edits to Exhibit A, only one was incorporated into the findings of fact.

¶ 56       Bearing in mind the principles of *In re: H.P.*, I agree with Respondent-Mother. Against a comprehensive review of the Record and the transcript of the adjudicatory hearing, a significant portion of these findings of fact are entirely unsupported by the evidence at the adjudicatory hearing. These unsupported aspects include, in significant part, Respondent-Mother's alleged statements about the status of her case involving her daughters in Finding of Fact 15; the attendees of the Child and Family Team Meetings, the information regarding Respondent-Mother's daughters and therapist Lisa Partin, Jason's weights, and the reference to the diligent efforts search in Finding of Fact 16; the status of Respondent-Mother's and Respondent-Father's relationship, Respondent-Father's statements regarding his criminal history, and several of the crimes included in his criminal record in Finding of Fact 18; the entirety of Findings of Fact 19 and 20; the status of Respondent-Mother and Respondent-Father's relationship, Respondent-Father's statements concerning the relationship, and some of Respondent-Father's statements concerning the false paternity story in Finding of Fact 21; some of the attendees of the CFT meeting, Respondent-Mother's recommendation for the child's placement, and the statement that there was a smoky

smell in Respondent-Mother's home[5] in Finding of Fact 23; the attendees of the meeting that Respondent-Mother requested in Finding of Fact 24; Respondent-Father's brother's statements regarding other plans and the difficulty reaching Respondent-Father in Finding of Fact 26; and the dates provided in Findings of Fact 17 through 22 and 25 through 27.

¶ 57        Here, like in *In re H.P.*, I struggle to conclude that "the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *Id.* at ¶ 23 (quoting *In re J.W.*, 241 N.C. App. at 48-49). While "[i]t is not *per se* reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party," the trial court's findings of fact that mirror the juvenile petition in this case so frequently contain statements unsupported by evidence on the Record that they do not appear to reflect the trial court's own "processes of logical reasoning." *Id.*

---

[5] I note that there was some discussion of this statement by Nurse Merrill on cross-examination only.  There was also some indication that the house smelled like incense from DSS employee Young; however, the allegations of the juvenile petition do not mention Respondent-Mother's smelling of smoke other than in reference to Nurse Merrill. *See In re A.B.*, 179 N.C. App. 605, 609 (2006) (emphasis added) ("Unlike in the dispositional stage, where the trial court's primary consideration is the best interest of the child and any evidence which is competent and relevant to a showing of the best interest of that child must be heard and considered by the trial court, *evidence in the adjudicatory hearing is limited to a determination of the items alleged in the petition*.").

¶ 58        Admittedly, this case is distinct from *In re H.P.* in two ways.  First, the findings

of fact did not undermine other findings of fact.  Second, DHHS's case was not limited

to Exhibit A as DHHS presented the testimony of two DSS employees that included

matters outside the scope of Exhibit A.  Nonetheless, our task is to determine

"whether the record of the proceedings demonstrates that the trial court, through

processes of logical reasoning, based on the evidentiary facts before it, found the

ultimate facts necessary to dispose of the case." *Id.* (quoting *In re J.W.*, 241 N.C. App.

at 48-49); *see also In re Anderson*, 151 N.C. App. at 97 ("Ultimate facts are the final

resulting effect reached by processes of logical reasoning from the evidentiary facts.").

And, reviewing the findings of fact holistically, it did not.[6]  The findings of fact in the

---

[6] I also note that the facts of this case are similar to those of *In re O.W.  See generally In re O.W.,* 164 N.C. App. 699 (2004).  In *In re O.W.*, we reversed an adjudication order based on the respondent-mother's argument that the trial court erred by failing to make ultimate findings of fact.  The order in *In re O.W.* contained "twenty findings of fact, fifteen of [which] [were] a verbatim recitation of the facts stated in [the] petition for abuse and neglect, some of which [were] unsupported by any evidence." *Id.* at 702.  We noted that several of the findings of fact were simple recitations of what someone else had told the DSS and that there was a lack of clarity regarding whether the trial court found an event had occurred or found DSS concluded there was an injurious environment based upon what someone told them. *Id.*  We held:

> [T]he trial court's findings are not "specific ultimate facts,"
> which are sufficient for this Court to determine that the
> adjudication of abuse and neglect is adequately supported by
> competent evidence.  We remand this order to the trial court to
> make appropriate findings of fact, not inconsistent with this
> opinion.  It is unnecessary for us to address the remainder of
> [the] respondent's [issues on appeal].

trial court's Amended Adjudication Order in this case were not "specific ultimate facts," and the Record does not demonstrate "that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *In re H.P.,* 278 N.C. App. 195, 2021-NCCOA-299 at ¶ 23. As a result, I would remand this order to the trial court to make appropriate findings of fact based upon the evidence, and I need not reach the other issues on appeal.

## **CONCLUSION**

The trial court's Amended Adjudication Order quoted the language included in the juvenile petition verbatim, including information not presented at the adjudicatory hearing at any point and only presented in the juvenile petition. Due to the pervasive reference to information that was not presented at the hearing, I cannot conclude "that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." *Id*. This constituted reversible error, and I would vacate the Amended Adjudication Order and related Disposition Order and remand for the entry of appropriate findings of fact based upon the evidence. Furthermore, for the reasons stated in the first

*Id.* at 704.

paragraph of this opinion, I would not allow the trial court's "orally rendered judgment" to play any role in our review.

For these reasons, I respectfully dissent.